[Cite as *Grubach v. Univ. of Akron*, 2020-Ohio-3467.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT


| | | |
|---|---|---|
| Paul Grubach, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 19AP-283 |
| v. | : | (Ct. of Cl. No. 2017-00750) |
| University of Akron, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |


D E C I S I O N

Rendered on June 25, 2020


**On brief:** *Daniel D. Domozick*, for appellant.

**On brief:** *Dave Yost*, Attorney General, *Randal W. Knutti*, and *Amy S. Brown*, for appellee.


APPEAL from the Court of Claims of Ohio

SADLER, P.J.

{¶ 1} Plaintiff-appellant, Paul Grubach, appeals from a judgment of the Court of Claims of Ohio in favor of defendant-appellee, University of Akron. For the reasons that follow, we reverse.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2} In August 2014, when appellant was 61 years old, he entered appellee's Integrated Bioscience ("IB") doctoral program with the goal of obtaining his Ph.D. in biology. Appellant had a master's degree in biology when he entered the IB program, and he had published works in the fields of ichthyology and ecology. Prior to entering the IB program, appellant had corresponded with Dr. Stephen Weeks via email regarding their mutual interest in having appellant attend the university as a doctoral candidate. Appellant

had learned of Dr. Weeks' work with invertebrate ecology and appellee's IB program via the internet. At the time appellant contacted Dr. Weeks, Dr. Weeks held the dual positions of chairman of the Department of Biology and director of the IB program. Dr. Weeks also holds a Ph.D. in ecology and evolutionary biology. Though appellant and Dr. Weeks corresponded via email prior to appellant's arrival on campus, the two did not meet prior to that time.

{¶ 3} There is no dispute in this case that the process of obtaining a Ph.D. in biology is set out in some detail in appellee's IB Graduate Student Handbook ("IB Handbook"). According to the IB Handbook, prior to the completion of the first semester of graduate work, the student must choose a major advisor and a Ph.D. advisory committee, typically consisting of the major advisor and four other faculty members with diverse expertise in areas related to the student's proposed course of study. Appellant chose Dr. Weeks to be his major advisor because of Dr. Weeks' expertise in invertebrate ecology in general and clam shrimp in particular. Appellant selected a Ph.D. advisory committee consisting of Dr. Randy Mitchell, a Ph.D. in biology, Dr. Zhong-Hui Duan, a Ph.D. in applied mathematics, Dr. Anne Wiley, a Ph.D. in zoology, ecology, evolutionary biology and behavior, and Dr. Peter Lavrentyev, a Ph.D. in aquatic ecology.

{¶ 4} The IB Handbook sets out the requirements for obtaining a Ph.D., including the time in which the doctoral candidate must complete certain milestones, in relevant part as follows:

> **J. Doctoral Candidacy Examination**
>
> - Scope of Examination: **The comprehensive written examination shall be administered by the PhD Advisory Committee before the beginning of the 5th semester.** * * *
>
> - Administration of the Examination
>
> * * * *There shall be only two possible outcomes of the examination, determined by majority vote of the PhD Advisory Committee: Pass or Fail. The Examination will consist of two parts: a written exam that, if passed, is followed by an oral exam. If the student fails either of the exams, they will be given one chance to retake the entire exam. A student cannot fail more than one exam (i.e., cannot fail the written, pass on a second try, and then fail the oral).*

> *Failure to pass the make-up exam or failing more than one exam results in dismissal from the program.* * * *
>
> **K.  Research Proposal Defense**
>
> The student will work with the major advisor to develop a research proposal to be presented and defended to the PhD Advisory Committee. * * * The PhD Advisory Committee shall decide on the time of defense, which should be no later than two months after the Comprehensive Examination. * * *
>
> * * *
>
> **N.  Annual Progress Reports**
>
> The degree candidate will present an annual written progress report to the PhD Advisory Committee each Spring semester. *Unsatisfactory progress as determined by the majority of the Committee may result in dismissal from the program.* These reports should be forwarded to the Director of the program for inclusion of the students file.
>
> **O. Completion of Research and Defense of Dissertation**
>
> *All PhD projects must be completed and dissertation defended within 6 years of beginning enrollment.* * * *

(Emphasis added; bold sic.)  (Def.'s Ex. E, attached to Nov. 27, 2018 Mot. For Summ. Jgmt.)

{¶ 5}   Other requirements of the IB doctoral program include maintaining at least a "B" average in classes and serving as a teaching assistant ("TA"), for which the candidate is paid a biweekly stipend during the academic year.  There is no dispute in this case that appellant's grades were excellent as was his teaching and research.

{¶ 6}   Even though appellant's classwork, teaching, and research continued to be well received, things took a turn for the worse when appellant sat for his comprehensive written examination.  In July 2016, appellant took his written comprehensive examination. The format of the examination was generally open book, with each advisory committee member posing three questions to appellant.  Pursuant to the IB Handbook, the advisory committee members graded the answers and individually determined a grade of pass or fail.  On July 26, 2016, Dr. Weeks sent the committee members the following email:

> Please get me your scores by the end of the week.  I will need to report two things to [appellant]:

> 1) An overall scoring of "pass" or "fail" for your portions of the writtens. That can be determined however you see fit. Everyone had multiple questions, so you will need to determine whether [appellant] did an acceptable job across all your questions.  You can weight questions equally or differentially as you see fit.
>
> 2) A short overview of how [appellant] did, which includes both positives and negatives in his performance.  If you believe he failed the writtens, please think about how much specific feedback you want to give [appellant] in case you will be asking him a similar set of questions for his 2nd attempt (i.e., don't "telegraph" exactly what he should have said on your various questions if you think you will ask him the same or similar questions for round 2).

(Def.'s Ex. G, attached to Mot. For Summ. Jgmt.)

{¶ 7}   When the results of the examination came in, Dr. Weeks and Dr. Mitchell graded appellant as a "fail," but Dr. Wiley and Dr. Duan graded appellant as an "overall pass."  Dr. Lavrentyev responded as follows:

> l have reviewed [appellant's] written exam now.  I did expect a deeper understanding and more work at the PhD level, particularly given the fact that the exam was open-book. *However, I accept his answers as satisfactory.  So he passes the exam.*
>
> Specifically, [appellant] is a bit shaky on some key ecological concepts such as meta-population and trophic cascades. While his answers are not wrong per se, they are verbose, generic, and not very precise.  This is especially true about the second question (eco-physiology).  The literature sources he used are few and mostly dated.  He also needs to learn how to build and test research hypotheses (third question).

(Emphasis added.)  (Def.'s Ex. G, attached to Mot. For Summ. Jgmt.)

{¶ 8}   Appellant argues that had Dr. Weeks accepted Dr. Lavrentyev's original passing grade, he would have passed the written examination.  Both the IB Handbook and the evidence support appellant's claim, as a passing grade from the majority of the committee means the student passes the written exam.  Nevertheless, after receiving the grades, Dr. Weeks sent the following email correspondence to Dr. Lavrentyev:

> BTW — I just wanted to let you know that both Randy and I failed [appellant] on our portions of the written exams.  It was for the exact same reason that you noted: he did not show a deep understanding of the material.

> Thus, if you really feel that his understanding of the topic(s) on your questions weren't up to the level expected of a PhD student, please don't feel that you would be "the bad guy" if you failed him.  Let me know if you think he really showed an acceptable level of understanding for your questions.

(Def.'s Ex. G, attached to Mot. for Summ. Jgmt.)

{¶ 9}  Dr. Lavrentyev replied as follows: "l hate to reverse my own evaluation, but I didn't know that passing/failing could be done separately for different questions.  While his first answer was OK, the second and third were pretty weak.  I just don't know whether he didn't take the exam seriously enough or it is the true measure of his abilities."  (Def.'s Ex. G, attached to Mot. for Summ. Jgmt.)  Dr. Weeks responded:

> You can score it however you deem appropriate.  Both Randy and I scored each question separately and then came up with the overall score for the exam.  It was easy for the two of us because he failed all 3 questions for both of us, so he naturally failed the entire exam for both Randy and myself.
>
> If you think he passed one question and failed two others, then you need to decide if all 3 questions were equally important.  If so, then he failed the entire exam.  On the other hand, if the one question he passed is much more important than the other two, then you would have to make a judgement [sic] call as to whether he should pass the exam overall.
>
> It is fine to "reverse" your decision, if you feel he did poorly.  From your message below, if you are questioning whether he "took it seriously enough," to me that suggests you believe he didn't do well enough to pass?  If you feel that way, then that is how you should score his performance.

(Def.'s Ex. G, attached to Mot. for Summ. Jgmt.)

{¶ 10}  Dr. Lavrentyev replied: "In this case, I think he should redo the 2nd and 3rd questions to pass."  (Def.'s Ex. G, attached to Mot. for Summ. Jgmt.)  On July 28, 2016, Dr. Weeks wrote to the committee members that appellant "passed two but failed three of the written exams, and thus he failed overall."  (Def.'s Ex. H, attached to Mot. for Summ. Jgmt.)  The evidence submitted by appellant reveals that Dr. Weeks never told appellant or any of the advisory committee members that Dr. Lavrentyev had originally graded appellant as a pass.

{¶ 11}  Dr. Weeks testified in his deposition that prior to the written examination, he had a "good relationship" with appellant.  (Weeks Dep. at 42.)  However, when Dr. Weeks

met with appellant after the examination results were revealed, appellant and Dr. Weeks got into a "very heated" discussion during which appellant accused him of "trying to torpedo his Ph.D." (Weeks Dep. at 100.) Appellant reportedly told Dr. Weeks he no longer wanted him as his major advisor.

{¶ 12} On September 30, 2016, Dr. Weeks sent appellant an email, copied to Dr. Hazel Barton, the new director of the IB program, wherein Dr. Weeks told appellant that he had not received any information from him regarding a new advisor or a plan to move forward. Dr. Weeks advised appellant "[u]nless we hear about your plan soon, you could be deemed 'not making sufficient progress' on your degree, which will put your funding at jeopardy." (Pl.'s Ex. 12, attached to Barton Dep.) On that same day, appellant informed Dr. Weeks and Dr. Barton that he had met with two faculty members but neither agreed to be his major advisor.

{¶ 13} On October 18, 2016, Dr. Barton presented appellant with a proposed written agreement setting forth certain milestones appellant was to accomplish in order for him to remain in the IB Ph.D. program along with deadlines in which to complete them. Appellant refused to sign the agreement claiming it was "flawed." (Pl.'s Ex. 16, attached to Barton Dep.) In his deposition, appellant clarified that the flaws in the agreement included an unrealistic timeline in which to complete the milestones and the fact that the agreement referenced Dr. Weeks as appellant's major advisor when he was no longer serving as such. At the point in time when Dr. Barton drafted the letter to appellant, he had been in the IB program a little more than two years.

{¶ 14} On January 18, 2017, Dr. Barton sent appellant a letter stating that he was behind on his Ph.D. studies and that he needed to complete the necessary milestones by the end of the Spring 2017 semester, including passing the candidacy written exam, passing the candidacy oral exam, completing and passing the proposal defense, and submitting a yearly progress report. Appellant testified he did not receive this letter until his attorney gave it to him in April or early May 2017. (Grubach Dep. at 98.) On April 14, 2017, appellant's legal counsel sent a letter to appellee complaining of unfair and discriminatory treatment by Dr. Weeks based on age, as well as multiple instances where appellant claims he was treated more harshly than other doctoral candidates. The letter also sought help for appellant in his efforts to find a new major advisor.

{¶ 15} Mark Stasitis, assistant general counsel for appellee, advised appellant's counsel that his investigation into the matter revealed no wrongdoing on the part of appellant's advisory committee or the IB department head and suggested that appellee's Office of Equal Employment Opportunity Programs and Affirmative Action ("EEO/AA") was the proper forum for appellant's claim of age discrimination. In his May 1, 2017 follow-up letter to Stasitis, appellant's counsel asked for a specific response to his request that appellee provide assistance to appellant in finding a new major advisor. Stasitis responded by informing appellant's counsel that it is the student's responsibility to find a major advisor.

{¶ 16} On May 10, 2017, appellant's Ph.D. advisory committee met to determine appellant's future in the program. Appellant attended the meeting and was given an opportunity to discuss his progress and defend his position. The committee found appellant had failed his written exam in summer 2016 and had neither retaken the test or found another major advisor. The committee voted unanimously that appellant was not making satisfactory progress toward his Ph.D. On May 17, 2017, Dr. Barton sent appellant a letter informing him that she had recommended his dismissal to Dr. Chand Midha, Dean of the Graduate School. On May 18, 2017, Dean Midha notified appellant that he was academically dismissed as a result of his failure to complete his written or oral candidacy exams or pass his proposal defense in accordance with the guidelines set forth in the IB Handbook. Appellant was dismissed from the IB Ph.D. program less than three years after commencing his studies. As a result of his dismissal from the IB Ph.D. program, appellant lost his job as a TA.

{¶ 17} On May 31, 2017, appellant submitted a request for a grievance hearing to Dean Midha. Stasitis reviewed the request and concluded the proper forum for the complaint was appellee's EEO/AA. On August 4, 2017, appellee's EEO/AA completed its review of appellant's complaint of age discrimination against Dr. Weeks and Dr. Barton and found they were not in violation of university policy or applicable laws.

{¶ 18} On September 8, 2017, appellant filed his complaint against appellee alleging breach of contract, age discrimination in violation of R.C. Chapter 4112(A), and retaliation in violation of R.C. Chapter 4112(I). On November 27, 2018, appellee filed a motion for summary judgment as to each of appellant's claims, arguing appellant had not produced

evidence to support a finding in his favor as to any of the elements of his prima facie case. On April 1, 2019, the Court of Claims issued a decision and judgment entry granting appellee's motion for summary judgment as to each of appellant's claims on finding that appellant failed to produce evidence to satisfy critical elements of his prima facie case for breach of contract, age discrimination, and retaliation and that appellee was entitled to judgment as a matter of law.  In granting summary judgment in favor of appellee, the Court of Claims declined to address appellee's alternative argument that appellant's claims for age discrimination and retaliation fail, as a matter of law, because all of appellant's allegations of discrimination and retaliation relate to appellant's status as a doctoral candidate and are not related to his employment as a TA.  Appellant has reasserted those alternative grounds in this appeal.

## II.  ASSIGNMENTS OF ERROR

{¶ 19}Appellant assigns the following as trial court error:

[1.] The trial court erred in granting summary judgment against Appellant on his Breach of Contract claims.

[2.] The trial court erred in granting summary judgment against Appellant on his Discrimination claim.

[3.] The trial court erred in granting summary judgment against Appellant on his Retaliation claim.

## III.  STANDARD OF REVIEW

{¶ 20}  Pursuant to Civ.R. 56(C), summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party.  *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).  "When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims."  *Lundeen v. Graff*, 10th Dist. No. 15AP-32, 2015-Ohio-4462, ¶ 11, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  "Once the moving party meets its initial burden, the nonmovant must set forth specific facts

demonstrating a genuine issue for trial." *Dunlop v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 19AP-58, 2019-Ohio-3632, ¶ 6, citing *Dresher* at 293.

{¶ 21} Appellate review of summary judgment is de novo. *Gabriel v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 14AP-870, 2015-Ohio-2661, ¶ 12, citing *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5. "When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination." *Gabriel* at ¶ 12, citing *Byrd* at ¶ 5, citing *Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 107 (10th Dist.1992). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Eichenberger v. Woodlands Assisted Living Residence, L.L.C.*, 10th Dist. No. 14AP-272, 2014-Ohio-5354, ¶ 10, citing *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

## IV. LEGAL ANALYSIS

### A. First Assignment of Error

{¶ 22} In his first assignment of error, appellant contends the Court of Claims erred when it granted summary judgment to appellee on his contract claim. We agree.

{¶ 23} In order to survive summary judgment, appellant must produce some evidence to support each element of his claim for breach of contract. *McDade v. Cleveland State Univ.*, 10th Dist. No. 14AP-275, 2014-Ohio-4026. Accordingly, appellant "was required to present evidence of 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.' " *Id.* at ¶ 15, quoting *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 18 (10th Dist.), citing *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 10 (10th Dist.2002). *See also Tate v. Owens State Community College*, 10th Dist. No. 10AP-1201, 2011-Ohio-3452.

{¶ 24} "It is axiomatic that '* * * when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.' " *Bleicher v. Univ. of Cincinnati College of Medicine*, 78 Ohio App.3d 302, 308 (10th Dist.1992), quoting *Behrend v. State*, 55 Ohio App.2d 135, 139 (10th Dist.1977). *See also Tate* at ¶ 21; *Jefferson v. Univ. of Toledo*, 10th Dist. No. 12AP-236, 2012-Ohio-4793, ¶ 15. In addressing the issue of whether such

contract has been breached, the trier of fact appropriately looks to the terms of the contract as found in the college guidelines supplied to students. *Bleicher* at 308, citing *Embrey v. Cent. State Univ.*, 10th Dist. No. 90AP-1302 (Oct. 8, 1991), citing *Smith v. Ohio State Univ.*, 53 Ohio Misc.2d 11, 13 (1990). *See also Lewis v. Cleveland State Univ.*, 10th Dist. No. 10AP-606, 2011-Ohio-1192, ¶ 14; *Buescher v. Baldwin Wallace Univ.*, 86 F.Supp.3d 789, 807 (N.D.Ohio 2015), citing *Embrey*. A trial court's standard for reviewing the academic decisions of a college or university is not merely whether the court would have decided the matter differently but, rather, whether the faculty action was arbitrary and capricious. *Bleicher* at 308. Accordingly, a trial court is required to defer to academic decisions of the college unless it perceived such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. *Id.*

{¶ 25} Appellant alleges appellee breached the contract as found in the IB Handbook, Graduate Assistant Handbook, and Graduate Bulletin in a number of different respects including "failing to ensure that Dr. Weeks and other faculty members treated [appellant] fairly, professionally and appropriately and free of arbitrary conduct," "failing to ensure that [appellant] was free from discrimination and retaliation," and "failing to permit [appellant] a grievance hearing." (Compl. at ¶ 42.) Though much of the contractual language quoted in the complaint, which is taken either from the IB Handbook, Graduate Assistant Handbook, and/or Graduate Bulletin, can be fairly characterized as aspirational in nature, the graduate bulletin does provide that "[b]y our behavior with one another we endorse a culture of diversity, celebrating the uniqueness of the individual and *developing our understanding and tolerance of differences in* gender, ethnicity, *age*, spiritual belief, sexual orientation, and physical or mental potential." (Emphasis added.) (Pl.'s Ex. 1 at 4-5, attached to Memo. Contra in Opp.) Accordingly, under the particular circumstances of this case, we disagree with appellee's threshold contention that the cited provisions are too vague and indefinite to support an actionable claim for breach of contract. Moreover, because this court's decision in *Bleicher* represents the "well settled 'standard for reviewing the academic decisions of a college,' " we will apply the *Bleicher* standard in our review of appellant's contract claim. *McDade* at ¶ 27, citing *Jefferson* at ¶ 16. *See also Kaczkowski v. Ohio N. Univ.*, 3d Dist. No. 6-05-08, 2006-Ohio-2373, ¶ 23 (*Bleicher* sets fort the

standard for "determining whether an *implied* contract between a university and a student * * * ha[s] been breached."  (Emphasis sic.)).

*1. Appellant's Failing Grade on the Written Comprehensive Examination*

{¶ 26} Appellant's primary contention is that appellee breached the contract by failing him on the written comprehensive examination.  Appellant claims that Dr. Weeks' conduct in convincing Dr. Lavrentyev to change appellant's grade on the comprehensive written examination from pass to fail raises a factual issue whether Dr. Weeks and Dr. Lavrentyev substantially departed from accepted academic norms and failed to actually exercise professional judgment in performing their respective roles as committee members. The Court of Claims made the following determination regarding appellant's claim:

> Upon review of the emails between Dr. Weeks and Dr. Lavrentyev, it is clear that the discussion between two committee members regarding [appellant's] written exam scores was not a breach of the contract.  Indeed, the IB Handbook requires that the PhD advisory committee take a majority vote to determine whether the IB student passes or fails the written exams.  After determining that two of the committee members had rated [appellant] as "overall pass," and two committee members had rated [appellant] as "fail," the IB Handbook required' that Dr. Weeks, as chair of the committee and [appellant's] major advisor, determine whether [appellant] passed Dr. Lavrentyev's portion of the exam.  The contents of the emails show that Drs. Weeks and Lavrentyev were discussing [appellant's] performance on the questions that they had drafted pursuant to the procedures in the IB Handbook.  The end result of the discussions was a determination that [appellant] had failed three portions and passed two portions, resulting in an overall fail.  Nothing in the email shows that Dr. Weeks harbored a discriminatory animus toward [appellant] based on his age.  Furthermore, the discussion displayed in the emails shows that all of the committee members were using their professional judgment to determine whether [appellant] was demonstrating the level of understanding of the material expected from a PhD candidate.  In short, the emails demonstrate that the committee members were exercising their professional judgment regarding [appellant's] performance on the written exams.

(April 1, 2019 Decision at 11-12.)

{¶ 27} Appellant takes exception to the lack of consideration by the Court of Claims of his theory that Dr. Weeks' age-related bias toward appellant provided probative and persuasive evidence in support of his breach of contract claim. Our initial review of the Court of Claims' decision reveals a certain degree of factfinding as opposed to a determination whether appellant provided evidentiary support for his breach of contract claim, as is required in the context of summary judgment. Additionally, by focusing solely on the text of the email correspondence in determining whether Dr. Weeks breached the academic contract, the Court of Claims essentially disregarded appellant's testimony that Dr. Weeks made several derogatory age-related comments to appellant prior to the written examination and that Dr. Mitchell made a derogatory age-related comment to appellant in October 2015.

{¶ 28} In appellant's deposition, he was asked about a comment Dr. Weeks made to him on their first meeting. The deposition reads in relevant part as follows:

> Q. Sometime in the summer of 2014, you say that Dr. Weeks said – and I'm not sure if this is an exact quote, but said, in substance, "I don't mean to sound ageist, but you are older than the typical graduate student, are you sure you want to continue, it may be a long time for you to find a job."
>
> Did I read that right?
>
> A. Yes, sir.
>
> Q. Tell me how and where you say that Dr. Weeks made those remarks.
>
> A. That remains a deep impression in my mind because that's the first thing he ever said to me when he saw me the first time in my entire life. We were in his office, and I wanted to have a meeting with him, and I walked into his office, he saw me for the first time, and that's exactly what he said. And I'll never forget that.

(Grubach Dep. at 38.)

{¶ 29} Dr. Weeks did not deny making a statement of this nature to appellant when they first met. It is certainly reasonable to conclude that Dr. Weeks' comment was more than merely a vague or ambiguous reference to appellant's age and that it represents probative evidence of a potential bias against Ph.D. candidates of appellant's age. There is no dispute that appellant was much older than appellee's typical Ph.D. candidates. Other evidence presented by appellant supports the conclusion that the age-related statement

Dr. Weeks made to appellant in August 2014 was not an isolated comment or stray remark, as appellant testified that Dr. Weeks made similar age-related statements in fall 2014 and summer 2015. According to appellant, Dr. Weeks asked him "[s]o how old are you?" and when appellant replied "[s]ixty-one," Dr. Weeks exclaimed "[o]h." (Grubach Dep. at 44.) When discussing appellant's hobby of practicing mixed martial arts in fall 2014, Dr. Weeks reportedly asked appellant "[s]o why do you still do that at your." (Grubach Dep. at 45.) Appellant testified Dr. Weeks stopped short of saying the word "age." (Grubach Dep. at 44-45.) Again, in summer 2015, Dr. Weeks ran into appellant in a hallway and said "[y]ou look surprisingly good for your age." (Grubach Dep. at 50.) Thus, the record contains evidence that Dr. Weeks made several comments to appellant that demonstrate a possible age-related bias towards his doctoral candidacy.

{¶ 30} At his deposition, appellant stated that Dr. Mitchell also made a comment to him that may reasonably be construed as evidence of an age-related bias against appellant. Appellant testified that in October 2015, Dr. Mitchell began asking appellant highly technical and complex questions during a discussion. According to appellant, when he asked for more time to provide answers, Dr. Mitchell inquired "[w]ell, how much time do you need? How old are you?" (Grubach Dep. at 63.) Though it is reasonable to construe Dr. Mitchell's statement as merely an expression of frustration with appellant, the statement is probative evidence of a possible age-related bias against appellant's doctoral candidacy. Dr. Mitchell failed appellant on all three questions on the comprehensive written examination and subsequently declined to become appellant's major advisor, essentially ending appellant's doctoral candidacy.

{¶ 31} The Court of Claims, in granting summary judgment to appellee on the breach of contract claim, gave no consideration to appellant's evidence that Dr. Weeks harbored a discriminatory animus towards him based on age and that such animus may have motivated Dr. Weeks to persuade Dr. Lavrentyev to change appellant's grade from pass to fail. The Court of Claims considered such evidence only in the context of appellant's statutory age discrimination and retaliation claims. In his deposition, Dr. Lavrentyev discussed, on cross-examination, the decision to change appellant's grade on the written examination from pass to fail. His testimony is as follows:

> Q. So if Weeks doesn't send you an email on July 28, you would not have changed your grade, you would have said he

passed right? The only reason you changed it from pass to fail is because of Dr. Weeks email, right?

A. Well, no, because I discussed it with him, and he explained how it works, because the Ph.D. Program was something new at the time.

Q. The what was?

A. It was new to me at the time because I was only on a few committees, and I never had faced this situation where a student performed poorly on a written exam, that's why I wasn't sure what it would entail if I failed the student. I didn't want to fail him to the point he would be dismissed.

Q. Why not?

A. Well, because I just felt he could perform better.

Q. So let me ask it again.

If Weeks doesn't send this e-mail on the 28th, and you don't have that phone conversation with him, then [appellant] would have passed his exam, you wouldn't have changed your grade, correct?

A. Well, you could say that, yes, but it was my own decision.

Q. It was your own decision because Weeks told you that [appellant] could redo Questions 2 and 3, correct?

A. He told me that I could grade questions separately.

(Lavrentyev Dep. at 80-81.)

{¶ 32} As set forth above, Dr. Lavrentyev's decision to change appellant's grade on the written examination from pass to fail created a significant impediment to appellant's progress toward his Ph.D. Dr. Weeks was the IB department head, the IB department chairman, and appellant's major advisor at the time the critical emails were exchanged. Dr. Lavrentyev admitted he was relatively new to the process at the time he graded appellant's written examination. Dr. Barton and the members of appellant's committee agreed it would be unfair and improper to consider a student's age in reviewing a student's academic performance. Dr. Barton further stated that it would not be proper for a major advisor to reveal to another member of the committee that the student had failed the advisor's portion of the written examination when the other committee member had yet to issue a grade for the student. The emails between Dr. Weeks and Dr. Lavrentyev establish that Dr. Weeks revealed to Dr. Lavrentyev that both he and Dr. Mitchell failed appellant on

every question.  Dr. Barton also asserted she would never ask another committee member to change the grade he or she had given the student on the written comprehensive examination.  Dr. Weeks admitted that it would be improper for a student's major advisor to instruct another committee member how to grade the written examination.  (Weeks Dep. at 27.)  Yet, the emails permit the inference that Dr. Weeks improperly influenced Dr. Lavrentyev to change appellant's grade from "overall pass" to "fail."

{¶ 33}  In our view, when construed in appellant's favor, as is required when ruling on a motion for summary judgment, appellant's evidence, if believed, demonstrates Dr. Weeks harbored a discriminatory animus toward appellant based on age.  The email correspondence between Dr. Weeks and Dr. Lavrentyev, when viewed in appellant's favor, permits the conclusion that Dr. Weeks substantially departed from accepted academic norms by persuading Dr. Lavrentyev to change appellant's grade from pass to fail.  Thus, it is permissible on this record to infer that an age-related bias, rather than the exercise of professional judgment, was the reason Dr. Weeks persuaded Dr. Lavrentyev to change appellant's grade on the written comprehensive examination.  Dr. Weeks has admitted that he never told appellant, Dr. Barton, or any of the other committee members that Dr. Lavrentyev had originally given appellant a passing grade on the written examination.  (Weeks Dep. at 104.)  According to Dr. Mitchell, however, Dr. Weeks told him "everybody is saying the same thing" about appellant's performance on the written examination.  (Mitchell Dep. at 54.)

{¶ 34}  Appellant also contends Dr. Weeks substantially departed from accepted academic norms when he refused to allow appellant to amend his responses to the two questions on which his responses were deemed "a bit shaky."  (Def.'s Ex. G, attached to Mot. for Summ. Jgmt.)  Dr. Lavrentyev testified on cross-examination as follows:

> Q.  So [appellant] could have retaken Questions 2 and 3 for you?
>
> A.  Yes.
>
> Q.  And assuming it was a good answer, you would have passed him?
>
> A.  Yes.  Definitely.
>
> Q.  Did you tell that to Dr. Weeks?
>
> A.  I did.

Q. Did you ever discuss it with him?

A. Yes.  He said that, "[appellant] should contact you about retaking the written exam."

Q. Dr. Weeks told you?

A. Yes.

Q. That [appellant] was going to contact you about retaking the exam?

A. Right.

Q. Did you know Dr. Weeks would not allow [appellant] to retake Questions 2 and 3 for you?

A. I don't know that.

(Lavrentyev Dep. at 61-62.)

{¶ 35} Dr. Lavrentyev testified he "fully expected [appellant] to come back and retake [the two exam questions]."  (Lavrentyev Dep. at 62.)  However, when Dr. Weeks was asked on cross-examination whether he told appellant Dr. Lavrentyev had offered to let him retake a portion of the written examination, he answered "I don't believe so."  (Weeks Dep. at 101.)  Appellant confirmed he was never told about Dr. Lavrentyev's offer.

{¶ 36} In granting summary judgment for appellee, the Court of Claims cited provisions in the IB Handbook which arguably require a student to retake the entire examination on receiving a failing grade.  Appellant, however, presented evidence that another doctoral candidate had been given an opportunity to retake a portion of a comprehensive written examination in the recent past.  (Weeks Dep. at 105; Pl.'s Ex. 10, attached to Jan. 31, 2019 Memo. Contra in Opp.)  Dr. Weeks also acknowledged it was "unclear from our guidelines" whether a committee member could permit a student to retake a portion of the written examination.  (Weeks Dep. at 101.)  Dr. Mitchell testified as follows:

Q. Okay. Is that permitted, as far as you understand, that you're allowed to change your grade from pass to fail if a student retakes a portion of your exam?

A. Yes, it seems to me that I don't see anything that would stop you from doing that.

(Mitchell Dep. at 52.)

{¶ 37} Appellee's position in this litigation is that Dr. Lavrentyev's original grade of "overall pass" was not a final determination but was subject to change.  Because appellant

had not been given a final grade by Dr. Lavrentyev at the time he discussed an offer to have appellant retake certain questions on the written exam and because the IB Handbook is "unclear" about a student retaking a portion of an examination, an issue of fact arises whether Dr. Weeks substantially departed from accepted academic norms by dictating the manner in which Dr. Lavrentyev administered and graded his portion of the written examination. (Weeks Dep. at 101.)

{¶ 38} The Court of Claims, nevertheless, made the following determination regarding the results of the written examination: "After determining that two of the committee members had rated [appellant] as 'overall pass,' and two committee members had rated [appellant] as 'fail,' the IB Handbook required that Dr. Weeks, as chair of the committee and [appellant's] major advisor, determine whether [appellant] passed Dr. Lavrentyev's portion of the exam." (Decision at 11.) The Court of Claims did not, however, identify any specific provision in the IB Handbook which would cloak a major advisor, such as Dr. Weeks, with authority to "determine whether [appellant] passed Dr. Lavrentyev's portion of the exam," and this court can find no such provision. (Decision at 11.) Nor has appellee cited any provision in the IB Handbook that would support the conclusion of the Court of Claims on this particular matter. Moreover, there is no evidence in this case to support a finding that it would be academically acceptable for one member of the advisory committee to determine whether a student passed a written examination administered by another member of the committee. Thus, the pronouncement of the Court of Claims on this issue is not defensible either under the IB Handbook or the evidence produced.

{¶ 39} We recognize that even though Dr. Weeks admitted making certain age-related comments to appellant, he denied that appellant's age played any role in his conduct as appellant's major advisor, and he denied improperly influencing Dr. Lavrentyev to change appellant's grade on the written examination. Dr. Weeks has maintained that he treated appellant fairly and that appellant's own conduct was the true reason appellant failed to make progress towards his Ph.D. The record does contain some support for Dr. Weeks' opinion, as there is evidence that appellant's behavior towards Dr. Weeks on learning that he had failed the written examination caused Dr. Weeks to withdraw from his position as appellant's major advisor and may have discouraged others from taking

appellant on. Appellant's subsequent inability to obtain a new major advisor after his falling out with Dr. Weeks ultimately led to appellant's dismissal from the IB Ph.D. program less than three years after he entered. Similarly, Dr. Lavrentyev insisted his decision to change appellant's grade from pass to fail resulted from the exercise of his own professional judgment, and he was not convinced by Dr. Weeks to fail appellant. A trier of fact could certainly find Dr. Lavrentyev's testimony believable even though he exhibited a degree of equivocation.

{¶ 40} " 'A court cannot weigh credibility when considering evidentiary material presented in favor of, or in opposition to, a summary judgment motion.' " *Havely v. Franklin Cty.*, 10th Dist. No. 07AP-1077, 2008-Ohio-4889, ¶ 36, quoting *Whiteside v. Conroy*, 10th Dist. No. 05AP-123, 2005-Ohio-5098, ¶ 75, citing *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d 163 (10th Dist.1985). "Thus, 'the credibility of an affiant [or deponent] is not generally considered when a court determines whether genuine issues of material fact exist * * * [and] a court should not choose among reasonable inferences or weigh the credibility of witnesses in deciding whether summary judgment is appropriate.' " *Havely* at ¶ 36, quoting *Hassan v. Progressive Ins. Co.*, 142 Ohio App.3d 671, 676 (10th Dist.2001). Such functions are for the trier of fact, not for a judge ruling on a motion for summary judgment. *Havely* at ¶ 36, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In the context of summary judgment and on this record, Dr. Weeks' and Dr. Lavrentyev's credibility is for the trier of fact to determine. Because there are factual issues whether Dr. Weeks and Dr. Lavrentyev substantially departed from accepted academic norms and did not exercise professional judgment in connection with appellant's written comprehensive examination, we hold the Court of Claims erred when it granted summary judgment in favor of appellee as to the breach of contract claim.

### 2. *Appellant's Request for A Grievance Hearing*

{¶ 41} Appellant also contends appellee breached the contract by refusing to allow his grievance to be heard in accordance with the IB Handbook, Graduate Assistant Handbook, and Graduate Bulletin. The IB Handbook contains the following reference to the student grievance policy:

> **I. PhD Candidacy**
>
> A student will be considered a PhD candidate only after having passed the Doctoral Candidacy Examination and the

> Research Proposal Defense. * * * *Potential student grievance(s) regarding his/her candidacy will be handled according to the specific grievance procedures outlined in the Graduate Student Bulletin.*

(Emphasis added; bold sic.)  (Def.'s Ex. E, attached to Mot. for Summ. Jgmt.)

{¶ 42} The grievance procedures appear in an appendix to the Graduate Bulletin and are identified as University Rule 3359-24-02.  Under the heading "purpose," the rule states: "The procedures set forth in this document are intended to provide graduate students with a formal channel of appeal and redress of grievances arising out of their academic and/or employment relationship with the University."  (Pl.'s Ex. 1, attached to Memo. Contra in Opp.)  The rule generally requires an initial effort on the part of the student to resolve the dispute with the faculty member, a recommendation by the dean of the graduate school to the senior vice president and provost as to the disposition of the complaint, a hearing before a student committee either on the request of the dean of the graduate school or the student, and an appeals process.[1]  University Rule 3359-24-02 does not specify the type of issues that fall within the scope of the rule.  Nor does the rule state the pursuit of a grievance is the exclusive remedy provided to a student who complains of unfair treatment in the academic or employment setting.

{¶ 43} On May 10, 2017, appellant's committee met and voted to dismiss appellant from the IB Ph.D. program.  On May 31, 2017, appellant filed the following request for a grievance hearing with Dean Midha:

> Please accept this correspondence as the filing of my grievance over my expulsion from the Integrated Bioscience Program.
>
> More specifically, I have been subjected to a long series of unusual, biased, unfair and discriminatory treatment, including my treatment regarding the written test procedures, which I did not pass.
>
> Also, it is claimed that I was released from the program because I failed to take the written test, oral exam and proposal defense within a three year period.  Nevertheless, other students in the program have failed to meet these criteria, and they were not expelled from the program.
>
> The attachments to this correspondence set forth in detail my claims of biased, unfair and discriminatory treatment as well

[1]Additional provisions detail the composition of the hearing committee, hearing procedures, decisions and actions, recordkeeping, and appeal.

as [appellee's] failure to follow its own procedures in dismissing me from the PhD program.[2]

(Pl.'s Ex. 21, attached to Memo. Contra in Opp.)

{¶ 44} On June 1, 2017, a series of email correspondence regarding appellant's grievance were exchanged between Dean Midha, Dr. Weeks, and Rex D. Ramsier, Senior Vice President and Provost, University of Akron. In the last of this correspondence, Provost Ramsier expressed his opinion regarding appellee's grievance procedures: "In my opinion failure to make progress toward degree should be handled like a grade appeal and not be subject to grievance. The latter is an archaic process with a hearing committee composed of students and faculty. I would rescind the rule if I had the authority." (Pl.'s Ex. 22, attached to Memo. Contra in Opp.)

{¶ 45} Following this correspondence, Stasitis determined the proper forum to resolve appellant's complaint was appellee's EEO/AA. Appellant did not receive a grievance hearing or the "grade appeal" referenced by Provost Ramsier. (Pl.'s Ex. 22, attached to

---

[2] An attachment to appellant's grievance reads as follows:

This is an attachment to my grievance regarding my expulsion from the Integrated Bioscience Program.

**Dr. Weeks violated the rules regarding the written test and PH D proposal defense in the Integrated Bioscience Graduate (IBG) Student Handbook.**

Dr. Weeks, Dr. Barton and company purported to apply the IBG Student Handbook to my expulsion. However, this was not the case:

First, Dr. Weeks specifically excluded my Ph.D. proposal from being on the written test, because sometime in January or early February of 2016, he told me to put my initial, unfinished Ph.D. proposal off to the side and concentrate on the readings for the test. We never had one meeting about my Ph.D. proposal in the entire year of 2016. And most importantly, my Ph.D. proposal is not on the list of things to study for the written test—it was thereby excluded from the written test.

During the course of the Spring 2016, Dr. Weeks stated that I would be tested on the Ph.D. proposal at my Ph.D. proposal defense. The written exam and Ph.D. proposal defense are two different tests, as is made clear in the IBG Student Handbook (page 7). But he then turned around and tested me on my Ph.D. proposal in his written exam, as every single one of his questions dealt with my initial, unfinished Ph.D. proposal.

Thus, he violated the rules by misleading me--he conflated the written exam with the Ph.D. proposal defense, thus violating the rules in the IBG Student Handbook.

(Emphasis sic.) (Pl.'s Ex. 21, attached to Memo. Contra in Opp.)

Memo. Contra in Opp.)   In granting summary judgment to appellee, the Court of Claims found as follows: "[W]ith regard to [appellant's] allegation that he was entitled to a grievance hearing, the only reasonable conclusion is that [appellee] exercised professional judgment when it directed [appellant] to the EEO office of the university to hear his complaints, when he specifically complained of unfair and discriminatory treatment." (Decision at 14.)   We disagree with the conclusion reached by the Court of Claims.   In our view, a reasonable reading of appellant's grievance request and the attachment thereto does not require the conclusion that a claim of unlawful discrimination, specifically age discrimination, is appellant's only complaint.  The request does not mention appellant's age and does not reference any of the age-related comments made to appellant by Dr. Weeks and Dr. Mitchell.  The attachment to appellant's grievance complains of purely academic decisions made by Dr. Weeks.

{¶ 46} Moreover, the IB Handbook provides "[p]otential student grievance(s) regarding his/her candidacy will be handled according to the specific grievance procedures outlined in the Graduate Student Bulletin."   (Def.'s Ex. E, Section I, attached to Mot. for Summ. Jgmt.)   Given the academic aspects of appellant's complaints and the mandatory language used in the IB Handbook, it is certainly reasonable to conclude that appellee's refusal to submit appellant's complaint to the grievance process was a substantial departure from accepted academic norms.  Furthermore, in light of Provost Ramsier's expressed antagonism towards the grievance procedure, it is certainly reasonable to conclude that the decision to circumvent the grievance process was not the result of an exercise of professional judgment.   Accordingly, we hold that the Court of Claims erred when it determined, as a matter of law, that appellee did not breach the contract by failing or refusing to follow the contractual grievance procedure.

{¶ 47} Based on the foregoing, we hold that there are genuine issues of material fact as to appellant's breach of contract claim and that the Court of Claims erred when it granted summary judgment to appellee on that claim.   Appellant's first assignment of error is sustained.

**B.  Second Assignment of Error**

{¶ 48} While our analysis of appellant's breach of contract claim in the first assignment of error under the *Bleicher* standard necessarily focused on the academic

aspects of the contract between the parties, our analysis of appellant's age discrimination and retaliation claims must focus on the terms and conditions of appellant's employment with appellee as a TA. Employment discrimination and retaliation claims under R.C. 4112.02(A) and (I) are generally to be interpreted in accordance with interpretations of federal antidiscrimination laws including Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 and the Age Discrimination in Employment Act, 29 U.S.C. 621 et seq. *Soliday v. Fluor Fernald, Inc.*, S.D.Ohio No. 1:04-CV-350 (Jan. 18, 2006), citing *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981). *See also Rufo v. Dave & Busters, Inc.*, S.D. Ohio No. 1:04-CV-698 (Dec. 16, 2005), *aff'd* by 6th Cir. No. 06-3111 (Jan. 31, 2007).

{¶ 49} In appellant's second assignment of error, appellant contends the trial court erred when it granted summary judgment in favor of appellee on appellant's claim of age discrimination. We disagree.

{¶ 50} R.C. 4112.02(A) prohibits "*any employer*, because of the * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter *directly or indirectly related to employment.*" (Emphasis added.) "To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent" and may establish such intent through either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). Absent direct evidence of age discrimination, a plaintiff may indirectly establish discriminatory intent using the analysis promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as adopted by the Supreme Court of Ohio in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146 (1983), and modified in *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723.[3]

---

[3] Under the federal regulatory scheme, the substantive provisions prohibiting age discrimination and retaliation in the terms and conditions of employment are found in the Age Discrimination in Employment Act, 29 U.S.C. 621 et seq. Section 623 provides in relevant part as follows:

Prohibition of age discrimination

(a) Employer practices. It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation,

### 1. Direct Evidence

{¶ 51} "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ceglia v. Youngstown State Univ.*, 10th Dist. No. 14AP-864, 2015-Ohio-2125, ¶ 16, citing *Conley v. U.S. Bank Natl. Assn.*, 211 Fed.Appx. 402, 405 (6th Cir.2006), citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003). "If that evidence is credible, 'discriminatory animus may be at least part of an employer's motive, and in the absence of an alternative, non-discriminatory explanation for that evidence, there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court.' " *Ceglia* at ¶ 16, quoting *Norbuta v. Loctite Corp.*, 1 Fed.Appx. 305, 312 (6th Cir.2001). "If a plaintiff can produce direct evidence of a discriminatory animus, ' "the burden [of production and persuasion] shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." ' " *Ceglia* at ¶ 16, quoting *Skelton v. Sara Lee Corp.*, 249 Fed.Appx. 450, 454 (6th Cir.2007), quoting *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir.2005).

{¶ 52} In *Tessmer v. Nationwide Life Ins. Co.*, 10th Dist. No. 98AP-1278 (Sept. 30, 1999), this court stated "[d]iscriminatory comments directed at or relating to the plaintiff [that] have not been found to be vague, ambiguous or isolated * * * have been found to be sufficient, direct evidence in a discrimination case." *Id.* In determining whether the employer's statements constitute direct evidence of age discrimination, the trial court must consider the following four factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

---

> terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>
> (3) to reduce the wage rate of any employee in order to comply with this Act.

*Ceglia* at ¶ 17, citing *Krupnick v. ARCADIS of U.S., Inc.*, S.D.Ohio No. 2:12-CV-273 (Mar. 13, 2014), citing *Skelton* at 455, citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir.2002) (internal citation omitted).

{¶ 53} In concluding the age-related comments made by Dr. Weeks and Dr. Mitchell in 2014 and 2015 did not constitute direct evidence of age discrimination, the Court of Claims found as follows:

> Upon review of the above-mentioned comments, the only reasonable conclusion is that any comments made in 2014 and 2015 are not proximate in time to the act of termination, i.e., dismissal from the IB program.  Therefore, the first five comments are not direct evidence of age discrimination. * * * Thus, none of the comments [appellant] alleges can be considered direct evidence of age discrimination.

(Decision at 17.)

{¶ 54} The Court of Claims acknowledged the statements reportedly made by Dr. Weeks in 2014 and 2015 and Dr. Mitchell in 2015 would constitute direct evidence of age discrimination had the comments been made to appellant more proximate in time to appellant's dismissal from the IB Ph.D. program on May 10, 2017.  However, in granting summary judgment to appellee on the age discrimination claim, the Court of Claims did not consider whether Dr. Lavrentyev's decision to change appellant's grade on the written examination would qualify as an adverse employment action for purposes of an age discrimination claim.[4]  The evidence is that appellant was given a failing grade on the comprehensive written examination in July 2016, ten months prior to his dismissal from the IB Ph.D. program.  The IB Handbook makes clear that passing the written examination is a required first step in appellant's effort to successfully complete the IB Ph.D. program and that a failure to pass the written examination after two attempts would result in appellant's dismissal from the program and the loss of his TA position.  Because the evidence permits the conclusion that age discrimination was a factor motivating the change of appellant's grade on the written examination and because appellant's failing grade on the

---

[4] "The Sixth Circuit defines an adverse employment action as a ' "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." ' "  *Allen v. Ohio Dept. of Job & Family Servs.*, 697 F.Supp.2d 854, 884 (S.D.Ohio 2010), quoting *Smith*, 378 F.3d at 575, quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999).  " '[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " (Internal quotation omitted.)  *Allen* at 884-85, quoting *Hollins* at 662.

written examination resulted, at least indirectly, in appellant's dismissal as a TA, such conduct arguably constitutes an adverse employment action that could support a prima facie case for discrimination. *Smith v. Salem*, 378 F.3d 566, 575-76 (6th Cir.2004) ("Examples of adverse employment actions include firing, failure to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indicies unique to a particular situation."). Whether the age-related statements made by Dr. Weeks and Dr. Mitchell in 2014 and 2015 were sufficiently proximate to the conduct that led to the change to appellant's grade on the written examination in July 2016 was not a question considered by the Court of Claims.

{¶ 55} Nevertheless, even if this court were to decide that appellant produced direct evidence of age discrimination, appellee has argued, alternatively, that the alleged discriminatory comments made by Dr. Weeks and Dr. Mitchell are not actionable under R.C. 4112.02(A) because they relate exclusively to appellant's academic progress and did not relate to his employment as a TA. This argument was raised by appellee in the Court of Claims but was not expressly relied on by the Court of Claims in granting summary judgment to appellee. In support of this argument, appellee relies on several federal court decisions arising under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. 2000e-2.[5]

{¶ 56} The federal court decisions on which appellee relies hold that if a graduate student holding a position as a paid TA at a university can be considered an "employee" for purposes of Title VII claims, such an employee does not have standing to invoke the protections of Title VII when the allegations of discrimination relate solely to the employee's studies or progress toward a degree. The decision of the district court in *Bucklen v. Rensselaer Polytechnic Inst.*, 166 F.Supp.2d 721 (N.D.N.Y.2001), is typical of these cases. In *Bucklen,* the issue for the district court was whether a graduate student who also worked as a TA had standing to assert a Title VII retaliation claim. The plaintiff argued the school discriminated against him on the basis of sex and national origin by failing to grant his requests to modify the format of the preliminary oral examination required for

---

[5] 42 U.S.C. 2000e-2, entitled "Employer practices," contains the same operative language as R.C. 4112.02(A) and provides in relevant part: "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

obtaining his doctoral degree and assigning him a failing grade on three separate occasions. *Id.* at 723. The plaintiff further alleged the failing grades caused him to be dismissed from the doctorate program which resulted in the loss of his job as a TA. *Id.* The district court decided even if the plaintiff had standing as an "employee" to file a Title VII action, the court could not "extend the parameters of Title VII to encompass purely academic decisions, such as the testing and qualification of doctoral students, that have only a tangential effect on one's status as an employee." *Id.* at 725.

{¶ 57} Other federal courts that have taken up the issue have reached similar conclusions. *See*, *e.g.*, *Stewart v. Morgan State Univ.*, 46 F.Supp.3d 590, 596 (D.Md.2014), *aff'd* by 606 Fed.Appx. 48 (4th Cir.2015) ("Plaintiff's argument that he received two 'Cs' from Dr. Welsh based on racial discrimination is unavailing considering that the grades he received in those two classes concerned his role as a student, *not* as an employee in the internship." (Emp. sic.)); *Stilley v. Univ. of Pittsburgh*, 968 F.Supp. 252, 261 (W.D.Pa.1996) (granting summary judgment as to plaintiff's discrimination claims against the university because "[a]ll issues pertaining to the completion of plaintiff's dissertation relate to plaintiff's role as a student and not as an employee. Accordingly [those issues] are not proper for a Title VII claim * * *."); *Seaton v. Univ. of Pennsylvania*, E.D.Pa. No. 01-2037 (Nov. 30, 2001) (dismissal of Title VII claim appropriate where "[t]he complaint does not suggest that Seaton was retaliated against as an employee; indeed, it emphasizes that the recipient of the [retaliatory] letter is Seaton's academic advisor" (Emphasis omitted.)); *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir.2007) (summary judgment for university appropriate as to plaintiff's Title VII retaliation claim where the alleged discriminatory activities "pertain to Bakhtiari's status as a student * * * and not as a TA employed by UMR"); *Al-Maqablh v. Univ. of Cincinnati College of Medicine*, S.D.Ohio No. 1:11-cv-531 (Nov. 5, 2013 magistrate's recommendation)[6] (citing *Bakhtiari*, *Seaton*, *Bucklen*, and *Stilley* with approval and recommending summary judgment for the university as to plaintiff's Title VII race or national origin discrimination claims because "the undisputed evidence establishes that the University's decision to dismiss Plaintiff from the Graduate Program was an academic decision unrelated to Plaintiff's alleged employment with the University [as TA]").

---

[6] Adopted by *Al-Maqablh v. Univ. of Cincinnati College of Medicine*, S.D.Ohio No. 1:11-cv-531 (May 19, 2014).

{¶ 58} The parties have not directed the court to any Ohio case law taking up this particular issue in the context of an R.C. 4112.02(A) discrimination claim, and this court has not uncovered any. Nevertheless, R.C. 4112.02(A) prohibits the same conduct prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2, and the Age Discrimination in Employment Act, 29 U.S.C. 621 et seq. Consequently, R.C. 4112.02(A) is generally construed in identical fashion to Title VII. *Soliday*, S.D.Ohio No. 1:04-CV-350, citing *Plumbers & Steamfitters*, 66 Ohio St.2d at 196. *See also Kimble v. Intermetro Industries*, 288 F.Supp.2d 876, 879 (N.D.Ohio 2003), citing *Plumbers & Steamfitters* at 196; *Blankenship v. BMI Refractories*, 966 F.Supp. 555, 557 (S.D.Ohio 1997), citing *Plumbers & Steamfitters* at 196. Accordingly, "evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is necessary before a violation of § 4112.02(A) can be found." *Kimble* at 879, citing *Plumbers & Steamfitters* at 196.

{¶ 59} In response to appellee's alternative argument, appellant relies on several federal court decisions including *Stewart*; *Cuddeback v. Florida Bd. of Edn.*, 381 F.3d 1230 (11th Cir.2004); and *Ruiz v. Trustees of Purdue Univ.*, N.D.Ind. No. 4:06-CV-130-JVB-PRC (Feb. 20, 2008 magistrate's recommendation).[7] However, we find these decisions do not support appellant's position.

{¶ 60} *Cuddeback* merely holds that a graduate student who also holds a position with the university as a paid TA may be considered an employee for purposes of Title VII. *Cuddeback* does not address the question whether a student/employee has standing to pursue a Title VII discrimination or retaliation claim where the allegations of discrimination relate solely to the student/employee's academic pursuits and do not relate to the student/employee's status as an employee.

{¶ 61} Similarly, in *Ruiz*, a doctoral candidate alleged that she was given poor grades and dismissed from the Ph.D. program due to discrimination. Because Ruiz's paid graduate assistant position was contingent on satisfactory academic progress, her dismissal from the Ph.D. program resulted in the loss of her position. In recommending summary judgment for the university, the magistrate noted that Ruiz's "discrimination claim is somewhat removed from her work" but noted that the university did not argue that failing grades did

---

[7] Adopted by and summary judgment granted in *Ruiz v. Trustees of Purdue Univ.*, N.D.Ind. No. 4:06-CV-130-JVB (Mar. 26, 2008).

not qualify as an "adverse employment action" under Title VII. *Id.* at fn. 4. Though the magistrate did find that Ruiz's work for Purdue qualified Ruiz as an "employee" for purposes of Title VII, the court cited the *Bucklen* case for the proposition that a student/employee may not have standing to file a Title VII action when the allegations of discrimination relate exclusively to academic decisions, " 'such as the testing and qualification of doctoral students, that have only a tangential effect on one's status as an employee.' " *Ruiz* at fn. 4, quoting *Bucklen*, 166 F.Supp.3d at 725. *Ruiz* does not support appellant's position.

{¶ 62} Finally, as noted above, the *Stewart* decision supports appellee's argument that a student/employee's discrimination claims are not actionable under Title VII where the alleged discriminatory conduct of the university relates exclusively to the student/employee's academic status. Accordingly, we find appellant's opposition to appellee's alternative argument unconvincing.[8]

{¶ 63} Title VII of the Civil Rights Act of 1964, in general, and 42 U.S.C. 2000e-2, in particular, prohibit an employer from discriminating against an employee with respect to the terms, conditions, and privileges of employment on the basis of sex, age, and race.[9] *See also Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 63 (1986); *Blankenship* at 557; *Kimble* at 879. R.C. 4112.02(A) prohibits the same conduct in the context of the employment relationship as a matter of state law and is generally construed in identical fashion to Title VII. *Kimble* at 879, citing *Plumbers & Steamfitters*, 66 Ohio St.2d at 196; *Blankenship* at 557, citing *Plumbers & Steamfitters* at 196. Accordingly, "evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is necessary before a violation of § 4112.02(A) can be found." *Kimble* at 879, citing *Plumbers & Steamfitters* at 196. *See also Patrick v. Ferguson Ents.*, S.D.Ohio No. 1:10-CV-00045 (Feb. 3, 2011) (age discrimination case).

{¶ 64} The allegations of age discrimination appellant leveled against appellee both in the complaint and as discussed herein, relate exclusively to appellant's studies and progress toward a Ph.D. Under the federal case law interpreting Title VII employment

[8] In affirming the district court, the Fourth Circuit in *Stewart v. Morgan State Univ.*, 606 Fed.Appx. 48 (4th Cir.2015), did not expressly adopt the district court's ruling on standing.
[9] As previously noted, the substantive federal legislation preventing age discrimination is found in the Age Discrimination in Employment Act, 29 U.S.C. 621 et seq.

discrimination claims, where the allegations of discrimination made by a paid TA relate exclusively to his or her status as a student and do not relate to the conditions of employment as a TA, the adverse employment decision is not actionable under federal antidiscrimination legislation, as a matter of law. *Bakhtiari*; *Seaton*; *Bucklen*; *Stilley*; *Al-Maqablh.* In such circumstances, the TA does not have standing to invoke the protections of Title VII. *Bakhtiari*; *Seaton*; *Bucklen*; *Stilley*; *Al-Maqablh.* Because Ohio courts generally follow federal precedent established under 42 U.S.C. 2000e-2 and in analyzing discrimination claims brought pursuant to R.C. 4112.02(A) and because the operative language of R.C. 4112.02(A) mirrors that of 42 U.S.C. 2000e-2, we hold that appellant's allegations of age discrimination are not actionable under R.C. 4112.02(A), as a matter of law.

{¶ 65} For the foregoing reasons, we hold the Court of Claims did not err when it granted summary judgment to appellee on appellant's discrimination claim, albeit for different reasons than the Court of Claims. *See Grenga v. Youngstown State Univ.*, 10th Dist. No. 11AP-165, 2011-Ohio-5621, ¶ 26 ("We review a summary judgment de novo and must affirm the trial court's judgment if any grounds the movant raised in the trial court support it."), citing *Koos v. Cent. Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 588 (8th Dist.1994), citing *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 711 (4th Dist.1993); *Ecker*, 101 Ohio App.3d at 41-42. *See also Brogan v. Family Video Movie Club, Inc.*, 6th Dist. No. L-13-1283, 2015-Ohio-70, ¶ 37 (in our de novo review of summary judgment matters, we may still inquire whether the judgment dismissing appellant's discrimination claim may be affirmed on alternative grounds); *Howell v. Whitehurst Co.*, 6th Dist. No. L-05-1154, 2005-Ohio-6136, ¶ 20-21 ("W[e] conclude that, presuming appellant can establish a prima facie case, we can alternatively affirm summary judgment on grounds that appellant cannot rebut appellee's legitimate justifications for her termination by showing pretext."). Appellant's second assignment of error is overruled.

### C. Appellant's Third Assignment of Error

{¶ 66} In appellant's third assignment of error, appellant argues the trial court erred when it granted summary judgment in appellee's favor on his retaliation claim. We disagree.

{¶ 67} R.C. 4112.02(I) makes it unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."  "The language of R.C. 4112.02(I) is virtually identical to 42 U.S.C. 2000e-3(a).  Due to the similarities in Title VII and R.C. Chapter 4112, Ohio courts look to federal case law addressing Title VII for assistance in interpreting R.C. Chapter 4112."  *Smith v. Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 60.

{¶ 68} "The antidiscrimination provision [42 U.S.C. 2000e-2(a)] seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status * * *.  The antiretaliation provision [42 U.S.C. 2000e-3(a)] seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII of the Civil Rights Act of 1964's] basic guarantees."  *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 63 (2006).  "The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status.  The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct."  *Id.*

{¶ 69} "An employee's activity is 'protected' for purposes of R.C. 4112.02(I) if the employee has 'opposed any unlawful discriminatory practice' (the 'opposition clause') or 'made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code' (the 'participation clause')."  *Veal v. Upreach, LLC*, 10th Dist. No. 11AP-192, 2011-Ohio-5406, ¶ 18, citing *HLS Bonding v. Ohio Civ. Rights Comm.*, 10th Dist. No. 07AP-1071, 2008-Ohio-4107, ¶ 15; *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719-20 (6th Cir.2008).

{¶ 70} Appellant contends that Dr. Weeks and Dr. Barton dismissed him from the IB program in retaliation for his decision to hire legal counsel and complain to appellee about age discrimination.  The trial court set forth the following reasoning in granting summary judgment to appellee on appellant's retaliation claim:

> [Appellant] alleges that the letters that his attorney sent to university officials in an effort to obtain a new advisor and to generally complain of [appellant's] treatment in the program

constitute a protected activity. However, it is undisputed that any participation that [appellant] engaged in, specifically, filing an EEO action, occurred after he was dismissed from the program. Therefore, any retaliation claim on that basis fails as a matter of law. Lastly, any opposition activity, i.e., letters from [appellant's] attorney, fall into the category of "a vague charge of discrimination in an internal letter or memorandum" and thus, are insufficient to constitute opposition to an unlawful employment practice. *See Booker*, *supra*. Accordingly, construing the evidence most strongly in [appellant's] favor, the only reasonable conclusion is that [appellant] has failed to state a prima facie case of retaliation.

(Decision at 20.)

{¶ 71} We agree with the conclusion of the Court of Claims that appellant failed to produce evidence to support a retaliation claim based on the participation clause because there is no dispute that appellant did not make his request for a hearing until after appellee dismissed him from the IB program. It is more difficult, however, to reconcile the conclusion of the Court of Claims regarding the opposition clause with the evidence produced by appellant.

{¶ 72} Appellant's opposition clause claim is predicated on two letters sent to appellee by appellant's attorney, Daniel D. Domozick. The first letter, dated April 14, 2017 and addressed to Assistant Dean Charles Beneke, contains a lengthy recitation of appellant's complaints about Dr. Weeks' conduct as his major advisor. The letter also contains a complaint about Dr. Barton's failure to help appellant find a new academic advisor even though Assistant Dean Beneke had informed appellant that "it was his understanding" she would do so. (Pl.'s Ex. 17 at 9, attached to Memo. Contra in Opp.) The April 14, 2017 letter closes with the following:

Thus, my investigation to date demonstrates that [appellant] is an outstanding Ph. D. candidate. However, [appellant] was treated much differently than other graduate students and was repeatedly threatened with expulsion, causing [appellant] an enormous financial and emotional injury. *At a minimum, Dr. Weeks is responsible for his wrongful conduct of discrimination and retaliation directed at* [*appellant*] *because of his age. My investigation also uncovered a number of age related comments directed at appellant*] *by Dr. Weeks, including Dr. Weeks asking* [*appellant*] *his age, making comments that* [*appellant*] *was "older" than the typical graduate student and that* [*appellant*] *"looked*

*surprisingly good for his age." Consistent with these age related comments, at every step Dr. Weeks' intentional and deliberate wrongful acts and omissions directed at* [*appellant*] *were done to harm* [*appellant*]. *There is no other rational explanation for Dr. Weeks' conduct.*[10]

(Emphasis added.)  (Pl.'s Ex. 17 at 10, attached to Memo. Contra in Opp.)[11]

{¶ 73} The Court of Claims' characterization of the April 14, 2017 letter as "a vague charge of discrimination in an internal letter or memorandum" is difficult to square with the plain language used by appellant's legal counsel.  (Decision at 20.)  In our view, the complaints about age discrimination levied against appellee in counsel's April 14, 2017 letter may be reasonably construed as a clear expression of opposition to discriminatory academic practices based on appellant's age.  Nevertheless, even though we disagree with the conclusion of the Court of Claims that the April 14, 2017 letter is merely "a vague charge of discrimination in an internal letter or memorandum," we nevertheless agree that the two letters from appellant's legal counsel "are insufficient to constitute opposition to an unlawful employment practice."  (Decision at 20.)

{¶ 74} As set forth earlier in our discussion of appellant's second assignment of error, appellee has convincingly argued that the age discrimination claim fails as a matter of law because the alleged discrimination related exclusively to appellant's academic progress in the IB Ph.D. program and was not related to his employment as a TA. *Bakhtiari*; *Seaton*; *Bucklen*; *Stilley*; *Al-Maqablh*.  As also set forth in our discussion of appellant's second assignment of error, there are a number of federal court decisions holding that a student/employee cannot maintain a Title VII retaliation claim where the claim of protected conduct on the part of the student/employee relates exclusively to discriminatory practices in the academic setting, such as the testing and qualification of doctoral students, that have only a tangential effect on one's status as an employee. *Seaton*; *Bucklen*.

---

[10] As of the date attorney Domozick drafted the letter, neither appellant nor his legal counsel were aware that Dr. Lavrentyev had changed appellant's grade on the written comprehensive exam from an "overall pass" to "fail."

[11] In a May 1, 2017 letter to Stasitis, appellant's counsel complained about Dr. Barton's lack of follow through on finding appellant a new major advisor and disputed Stasitis's claim that Dr. Weeks remained appellant's major advisor.  The letter does not mention age discrimination.

{¶ 75} Here, even if we were to conclude that a factual issue exists whether the two letters from appellant's attorney constitute clear opposition to discriminatory age-related practices, none of the alleged discriminatory practices about which appellant complains relate to the conditions of his employment as a TA. Because there is no question that the discriminatory academic practices opposed by appellant are not related to the conditions of appellant's employment as a TA, appellant's conduct in opposition to those practices is not a protected activity under R.C. 4112.02(I), as a matter of law. *Seaton*; *Bucklen*. *See also* *Bakhtiari*; *Stilley*; *Al-Maqablh*.

{¶ 76} For the foregoing reasons, we hold the Court of Claims did not err when it granted summary judgment to appellee on appellant's retaliation claim, albeit for a different reason than expressed by the Court of Claims. Appellant's third assignment of error is overruled.

## V. CONCLUSION

{¶ 77} Having overruled appellant's second and third assignments of error but having sustained appellant's first assignment of error, we affirm in part and reverse in part the judgment of the Court of Claims of Ohio and remand this matter for further proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part*;
*cause remanded.*

BROWN, J., concurs.
LUPER SCHUSTER, J., concurs in part and dissents in part.

LUPER SCHUSTER, J., concurring in part and dissenting in part.

{¶ 78} I agree with the majority's resolution of the portion of appellant's first assignment of error finding that there remains a question of material fact as to whether appellee failed to or refused to follow the contractual grievance procedure, and I join in that portion of the majority's decision. However, because I would not sustain the portion of appellant's first assignment of error related to appellant's failing grade on the written exam, and because I would overrule appellant's second and third assignments of error on more limited grounds than the majority, I respectfully concur in part and dissent in part.

{¶ 79} As the majority notes, in a breach of contract case, the plaintiff bears the burden of presenting evidence establishing the existence of a contract. *McDade v. Cleveland Univ.*, 10th Dist. No. 14AP-275, 2014-Ohio-4026, ¶ 15. Though appellant relies

on the IB Handbook, Graduate Assistant Handbook, and Graduate Bulletin as creating a contract between appellant and appellee, it is also appellant's burden to demonstrate specific language in those materials that create binding contractual provisions. In considering whether there remains a genuine issue of material fact on appellant's claim for breach of contract related to his failing exam grade, the majority relies on *Bleicher* for the standard a court must apply in reviewing college academic decisions. Though I agree that *Bleicher* sets forth the proper standard, I do not agree with the majority that appellant adequately established the existence of specific contract language to trigger the *Bleicher* analysis.

{¶ 80} Here, the majority characterizes the language appellant relies upon as creating a contract related to his failing grade as "aspirational in nature," yet nonetheless concludes this language is sufficient to support an actionable claim for breach of contract. I disagree.

{¶ 81} Appellant points to language in the student materials providing that students will not be subjected to discrimination or be treated unfairly. However, "[i]ndefinite and aspirational language does not constitute an enforceable promise under Ohio law." *Ullmo ex rel. Ullmo v. Gilmour Academy*, 273 F.3d 671, 676-77 (6th Cir.2001) (holding "a breach of contract claim will not arise from the failure to fulfill a statement of goals or ideals"), citing *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376 (1997). I would conclude these terms in the student materials are aspirational in nature and not specific enough to create enforceable terms of a contract. *See Knelman v. Middlebury College*, 898 F. Supp.2d 697, 709 (holding "[l]anguage in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable"), citing *Ullmo* at 676-77. *See also Clayton v. Cleveland Clinic Found.*, 8th Dist. No. 101854, 2015-Ohio-1547, ¶ 11 (finding anti-discrimination and anti-harassment provisions in an employee handbook do not create any contractual obligation or rights); *Pierce v. Bishop*, 4th Dist. No. 10CA6, 2011-Ohio-371, ¶ 13, 22 (noting that the existence of a duty for purposes of a negligence action can be found in the express or implied terms of a contract, but that "general and aspirational" policies regarding general concern for the safety of a company's employees and the public are not sufficient to create contractual language establishing a duty); *Sagonowski v. The Andersons, Inc.*, 6th Dist. No. L-03-1168,

2005-Ohio-326, ¶ 51-55 (holding that an "Employee Bill of Rights" did not create specific contractual terms but rather reflected "qualified aspirational statements" that were insufficient to create a question of material fact regarding the existence of a contract in an at-will employment setting); *Olive v. Columbia/HCA Healthcare Corp.*, 8th Dist. No. 75249, 2000 Ohio App. LEXIS 914 (Mar. 9, 2000) (concluding a hospital's "aspirational statement of policy that it would take corrective action in a uniform, consistent, and non-discriminatory manner" was not sufficient to create a binding contract).

{¶ 82} Because I would conclude that appellant did not identify any portion of the student materials creating enforceable contract provisions related to his allegation that appellee breached a contract not to discriminate, I would not proceed to engage in the *Bleicher* analysis. Instead, I would overrule the portion of appellant's first assignment of error related to his failing exam grade because he did not present evidence demonstrating the existence of an enforceable contract provision related to discrimination. However, because appellant does point to specific, enforceable contractual language related to the grievance procedure, I concur with the majority's decision sustaining that portion of the first assignment of error.

{¶ 83} As to appellant's second and third assignments of error, I agree with the majority that both appellant's discrimination and retaliation claims fail because appellant's allegations relate exclusively to his academic studies and progress toward his degree and do not relate to the conditions of his employment. As such, I find it unnecessary to analyze, as the majority does, whether appellant set forth sufficient facts to overcome summary judgment on his discrimination and retaliation claims because his claims are legally insufficient. Thus, I would accordingly limit the analysis on the second and third assignments of error to appellant's failure to allege discriminatory conduct related to his employment, and I would overrule those two assignments of error on that basis.

{¶ 84} Based on these reasons, I respectfully concur in part and dissent in part.

_____